JOHN M. DURST v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY.[1]

April 22, 1927.

No. 25,816.

**New trial granted because of improbability of freight train conductor's testimony.**
   Action for personal injuries. The facts as stated by plaintiff are so improbable and his testimony is discredited to such an extent that there should be a new trial.

New Trial, 29 Cyc. p. 820 n. 35; p. 833 n. 61.

Defendant appealed from an order of the district court for Stearns county, Roeser, J., denying its alternative motion for judgment or a new trial. Reversed and new trial granted.

*John E. Palmer* and *James R. Bennett, Jr.*, for appellant.
*Donohue & Quigley* and *Tautges & Wilder*, for respondent.

TAYLOR, C.

This action is brought under the federal employers liability act to recover for injuries claimed to have been sustained by reason of a violation of the federal safety appliance act. The jury found for plaintiff and defendant appealed from an order denying its alternative motion for judgment non obstante or a new trial.

Plaintiff was the conductor on one of defendant's freight trains and was engaged in interstate commerce. His run was from Milwaukee, Wisconsin, to Fond du Lac in the same state. On January 31, 1924, plaintiff with a train of between 50 and 60 cars and the usual crew left Milwaukee at 9:30 p. m., about an hour and a half late. They seem to have made lengthy stops and done switching at nearly every station, and did not arrive at Fond du Lac until after 9 o'clock on February 1, several hours late.

[1] Reported in 213 N. W. 738.

They reached Rugby Junction at 1:20 a. m., where they remained for more than an hour engaged in switching, taking on coal and water, and getting a lunch. Plaintiff states that while the crew were switching and taking on coal and water in another part of the yard he walked along the train, beginning at the front end, to check the numbers of the cars with the list furnished him; that when about a third of the length of the train from the front, he discovered that the coupling between two cars had parted and that the coupling knuckles were six or eight inches apart; that he found that the knuckle pin was too small and had broken; that he went to the caboose, procured a new pin and returned; that as he was removing the broken pin the coupling knuckle slipped and fell striking across the insteps of his feet which were close together; that he was standing on the snow between the rails which was packed rather hard; that "when the knuckle struck my insteps my feet kind of sank down into the snow," there was "some give under them;" that he wore heavy woolen socks, ordinary shoes and heavy overshoes; that it was very cold and his feet were cold and numb; that he picked up the knuckle, put it in place, inserted the pin and set the coupling to make on impact; that he then went to the depot, took off his shoes and socks, and examined his feet; that they were red and numb but did not pain him much and the skin was not broken; that he said nothing about the accident or the broken pin to any of the other members of the train crew and performed his duties as usual during the remainder of the trip; that when he reached home his feet had become more painful and he put them in hot water, and his wife applied hot bandages and witch hazel; that the next day he was unable to step on the balls of his feet and when he attempted to do so it felt as if the joints were "loose and grinding;" and that he has never since been able to walk except on his heels.

The story of the accident rests wholly on plaintiff's testimony and defendant contends that no such accident happened. That he now has a pronounced case of flat feet is unquestioned. He claims that prior to the accident he never had anything in the nature of flat feet, that his feet were normal in all respects and that he never had any trouble with them. At that time he weighed 235 pounds. De-

fendant presented a large amount of evidence tending to show that he had flat feet long before the accident and had worn arch supports on account of that condition.

The rules required plaintiff to report such accidents at once by telegraph and blanks were kept in the caboose for that purpose. He made no telegraphic report. He says he did not know the injury was serious and did not pay much attention to it, "thought it was just merely a bad bump." He states, however, that at the end of the trip he made out his usual reports and sealed them in an envelope, and also made a report of his injury and sealed it in a separate envelope and placed both in the mailbox in the yard office. The officials state that they never received the report of the injury although they received the other reports which he says he placed in the same box at the same time. On February 21, 1924, he sent in a written report of the injury attached to a letter in which he said, "the reason for not sending this report before this date was due to not having report blanks." He made no mention of having sent a prior report.

Plaintiff was dismissed from the service of the company and notice of his dismissal was prepared on January 31, 1924, to be delivered to him on his arrival at Fond du Lac on February 1. The call boy states that he delivered it to him personally at the yard office on that date. Plaintiff states that he never received that notice and that his first knowledge of his dismissal was received over the telephone on February 6. On the evening of the sixth he took the train for Minneapolis to see John B. Barton, the general chairman of the committee of adjustment of the Order of Railway Conductors, about getting reinstated. He reached Minneapolis on the morning of the seventh and went to the office of the chairman before Mr. Barton arrived. There he met Conductor Mantz, an old acquaintance, and told him of his dismissal. Mantz says that plaintiff handed him the notice of January 31 stating the reason for his dismissal and that he, Mantz, read it at that time. After Barton arrived and plaintiff had made known his errand, the three walked over to the Soo office, a distance of three blocks. Both Barton and Mantz state that, at

this interview, plaintiff made no mention of having sustained an injury and that there was nothing to indicate that he had any trouble in walking. Some months later he sought persistently to induce them to remember that he had told them, at this interview, of the knuckle falling on his feet and had asked Barton as to making a report of the injury to the company, but they were positive that he had said nothing about any such accident and so informed him. Mantz testified that after he had read the notice of dismissal which plaintiff had handed him, plaintiff said that he was going to sue defendant for defamation of character but said nothing about any injury.

Plaintiff says that the accident happened on February 1. On February 3 he attended a banquet and dance of the lodge of railway conductors of which he was a member. He says he was unable to dance on account of the condition of his feet. Several of those present were called as witnesses and testified that he danced as usual and that they noticed nothing unusual in his walk and heard nothing of any injury. More than 20 of his acquaintances who had associated with him more or less in the first months following the alleged injury were called as witnesses and testified that he walked as usual during this period, exhibited no indications of having been injured and made no claim of having been injured. Plaintiff called none of his acquaintances or associates to testify that his condition was otherwise than as stated by these witnesses. He failed to get reinstated and later brought this suit.

The record is lengthy covering more than 1,200 pages and gives many important facts to which we have made no reference. We have merely referred to a few matters to indicate the nature of the claim asserted and the general nature of the facts which impel us to the conclusion we have reached.

Plaintiff's claim rests upon his own testimony corroborated in some particulars by that of his wife. It has no other support in the record. That a mass of iron weighing 50 or 60 pounds falling nearly three feet and striking "right across my insteps" neither crushed the insteps nor broke nor dislocated any bones nor even broke the skin, and caused so little disability at the time that plaintiff con-

tinued to perform his usual duties in the usual manner for more than seven hours without considering the injury of sufficient consequence to report it as required by the rules or even to make it known to any of his crew, is so highly improbable and his testimony is discredited by such a mass of contradictory evidence that we are forced to the conclusion that a new trial is necessary in the interest of justice.

While there may have been some errors in the admission of evidence of which plaintiff may have taken an undue advantage in his argument to the jury, the conclusion reached upon the main question renders it unnecessary to consider other questions. Order reversed and a new trial granted.